GEORGE M. RETAN, Plaintiff, *v.* EDWARD MATHEWSON and Another, Defendants.

Supreme Court, Onondaga County, December 10, 1927.

**Husband and wife — annulment of marriage for non-age — evidence justifies judgment annulling marriage of plaintiff's daughter under Domestic Relations Law, § 7, subd. 1.**

This is an action by a father to have the marriage of his daughter annulled under subdivision 1 of section 7 of the Domestic Relations Law. At the time of the marriage the daughter was seventeen years of age and her husband was approximately twenty years of age. Effort was made to prevent the young people from marrying but they eloped and after a short honeymoon returned to their parental homes upon the insistence of the plaintiff. The evidence shows that the girl proposed marriage and was apparently deeply infatuated with her husband, but later determined that she did not care to return to him. In view of all the facts and circumstances, and the youth of the girl, the plaintiff is entitled to a judgment annulling the marriage.

PROCEEDING for annulment of marriage under subdivision 1 of section 7 of the Domestic Relations Law, as amended by chapter 313 of the Laws of 1922.

*Lewis C. Ryan,* for the plaintiff.

*William C. Martin,* for the defendant Edward Mathewson.

*Lee Olmsted,* for the defendant Geraldine Mathewson, by guardian, etc.

WILLIAM F. DOWLING, J. The plaintiff is a practicing physician of the city of Syracuse, N. Y. He is a man of both affluence and influence. He and his family enjoy the respect of the community.

Mr. Wilson D. Mathewson, father of the defendant, is a consultant experimental engineer, connected with the Brown-Leipe Company, a large manufacturing concern of Syracuse. He is a man of intelligence and refinement and of some means. He and his family live in good circumstances and enjoy the respect of the community in which they reside. The two families, however, move in different social circles.

The plaintiff is the father of the defendant Geraldine J. Mathewson. She was born May 30, 1910. Defendant Edward Mathewson was born July 20, 1907. Edward and Geraldine Mathewson became acquainted about five years previous to the trial, having met at some church function. About three years ago Edward Mathewson began to pay more than ordinary attention to Geraldine Retan. Their acquaintanceship ripened into friendship, and their friendship into mutual affection of the kind that usually exists between a boy and girl of that age. Edward visited Geraldine at her home quite frequently. In the winter and spring of 1926 he was demanding the exclusive right to her society. On becoming aware of the situation, the plaintiff and Mrs. Retan attempted to reason with their daughter to the effect that she was too young to surrender her attentions to any particular young man; that she should broaden her acquaintance and not commit herself to one gentleman friend until she had reached an age where she could form a valid judgment of men. In the spring of 1926 the plaintiff talked matters over with Edward Mathewson, told him of the discussion he had had with his daughter, and forbade him calling upon her. Geraldine promised her parents that she would follow their advice. Edward Mathewson ceased to call upon her at plaintiff's home, but persisted in watching the Retan home evenings, until his actions attracted the attentions of the neighbors. One evening, as he was walking up and down past plaintiff's residence, plaintiff warned him that he must discontinue

the practice as his presence there had aroused the curiosity of the neighborhood; a heated argument ensued, which did not serve to increase Edward's standing with Dr. Retan. Apparently, after this interview, Edward discontinued reconnoitering the plaintiff's home.

Geraldine was then a junior in the high school. Edward had left school before completing his high school course. In June, 1923, he entered the employ of the Brown-Leipe Company as time clerk. He continued there until September 1, 1923. On March 27, 1925, he re-entered the employ of the same company and remained there until October 30, 1926, when he left, returning again November 8, 1926, and continuing in the employ of that company until April 2, 1927. When he finally left that company's employ, he was receiving twenty-five dollars per week. While in the employ of the Brown-Leipe Company Edward made rapid advancement. After leaving the employment of said company, he made a connection in the sales department of the Service Appliance Store in Syracuse, selling washing machines and vacuum cleaners to house holders. He had an income from this work of twenty dollars a week.

At the close of the school year in 1926, the plaintiff sent his wife and daughter Geraldine to the Thousand Islands for the summer, in an attempt to break up whatever intimacy then existed between his daughter and Edward Mathewson. Shortly after Mrs. Retan and Geraldine reached the Islands, Edward Mathewson appeared on the scene. Thereupon, Mrs. Retan and her daughter returned to Syracuse and from Syracuse they went to Atlantic City, where they spent the greater part of that summer. Upon their return from Atlantic City, Dr. and Mrs. Retan decided that they would send Geraldine to Cazenovia Seminary in order that she might widen and broaden her acquaintenance with young men, and to keep her from seeing Edward Mathewson. She remained there one term. Dr. and Mrs. Retan, supposing they had broken up the intimacy that existed between Geraldine and Edward, and supposing that she had been weaned from any further affection for him, allowed her to resume her studies in the Syracuse High School in January, 1927, where she continued until May 31, 1927.

From the spring of 1926 until May 31, 1927, Geraldine led her parents to believe that she was afraid of Edward Mathewson; that she no longer had any affection for him, when as a matter of fact, during that entire period, she had been corresponding with him and meeting him clandestinely at his home and other places. She was guilty of the grossest duplicity with her own parents.

On her sixteenth birthday she broached the question of marriage to Edward Mathewson. Certain of her letters were introduced in

Misc. 106]            Supreme Court, December, 1927.

evidence, wherein she urged him to marry her, writing she could not survive without him. Running through the letters to him is a silly, sentimental love strain, the product of a gushing, immature schoolgirl. True affection for Edward she had not, nor was she mentally capable of comprehending such a lofty and noble passion.

Geraldine was to graduate from the Syracuse High School in June, 1927. In complete ignorance of her mad infatuation, her matrimonial inclinations and designs, her parents had arranged to matriculate her at Syracuse University in the fall of 1927. She was destined to be the fortunate recipient of a collegiate training. Edward Mathewson likewise concealed the true situation from his parents, while giving the impression to Geraldine's that relations between him and their daughter had ceased.

On the 31st of May, 1927, Edward and Geraldine, without the knowledge, consent or approval of their parents, went to Solvay, Onondaga county, N. Y., where they were married, Geraldine falsely certifying that she was over eighteen years of age, in order to procure the requisite marriage license. They returned home' where they remained for a day or two until Edward could procure sufficient funds for a journey to Toronto. He had saved up $200 with which he had acquired a real estate bond. This he sold for that amount. The $200 acquired from the sale of the bond, and $20, which he had coming from the appliance company, constituted his entire earthly possessions. With this limited bankroll, he and his child-wife, without informing Geraldine's parents of the marriage, or of their intent to enjoy a honeymoon, secretly left Syracuse for Toronto, Can. Upon their arrival there, they went to the address of a Mrs. DeChere, to rent an apartment. Mrs. DeChere, seeing that they were children of good breeding, took pity upon them and took them into her home where they remained for a period of several days. Upon arriving at Toronto, Edward notified his mother of his whereabouts, but, at the request of Geraldine, he instructed her not to notify her parents, as she feared they would come and bring her home.

After a honeymoon of a few days at Mrs. DeChere's, Geraldine became restless, nervous and homesick. The young couple quarreled, funds were low, no work in sight for either of them. Edward was pressing his wife to obtain work as a waitress or to become a waitress on a boat on the Great Lakes where he would gain employment as a dancer, and in this way they could make money and maintain themselves. He also requested her to write the maid in her home to forward her fur coat, evidently with the idea of putting it in pawn and acquiring money. Mrs. DeChere, observing the predicament in which they were, finally induced

Geraldine to disclose the address of her parents, whereupon she notified them of Geraldine's whereabouts. Dr. Retan immediately, in company with his friend and attorney, Mr. Ryan, visited Toronto and after a considerable discussion prevailed upon the young couple to return to Syracuse, Geraldine to her father's house, Edward to his father's house. Since then they have lived separate and apart.

There was an understanding between Edward Mathewson and Dr. Retan, at Toronto, that Mrs. Retan should be the one to decide whether or not he and Geraldine should resume marital relations. Edward visited the home of the doctor a day or two following the return to Syracuse, in an effort to see his wife. The doctor refused him admittance. From then to the time of the trial, he had not seen her.

Some few days after Geraldine returned home, she and her mother went to Atlantic City where they spent several weeks. Dr. and Mrs. Retan finally determined that they would put the proposition to Geraldine as to whether or not she wished to resume marital relations with her husband or go to college. After due reflection, Geraldine determined that she did not wish to return to her husband.

In the fall of 1927 she went west and entered some institution where she undertook the study of pharmacy. Upon the trial of the case, Geraldine appeared by guardian *ad litem*, filed an answer asking annulment of the marriage. She did not appear in person. Her husband sought her presence upon the trial, but was unaware of her whereabouts. At the close of the evidence, upon the request of counsel for the defendant Edward Mathewson, the case was held open until the 15th of November 1927, so that said defendant might have an opportunity to take the evidence of Mrs. Mathewson. On November 15, 1927, counsel for the defendant Edward Mathewson notified the court as follows: " After talking the case over with the defendant and his guardian *ad litem*, we desire at this time to say that we have no further proof to offer and, therefore, rest our case." Defendant Edward Mathewson objects strenuously to an annulment of his marriage, claiming that he is of sufficient age and earning capacity to properly support his wife, and that he is anxious and desirous of resuming the marriage relation. His parents sustain him in this position, offering to assist him in the maintenance of a home.

The plaintiff and his wife object to a continuance of the marriage relation on the ground that no affection exists between this young couple; that their daughter was merely infatuated with Edward Mathewson, due to the fact that he is a handsome young man; that she did not know her own mind; that she was really beside

herself in her mad infatuation for him; that there was never any real love existing between them; that she is only a child; that as her parents, they have a duty to guard her, to guide her course, particularly along matrimonial lines, so that at the proper time, when she has reached the age of discretion, when she knows her own mind, she may make a proper and suitable marriage. They contend that they not only have this duty to perform, but that they have a natural and moral right to have something to say as to when and to whom their daughter shall give herself in marriage. They feel that a continuance of this marriage would open up old sores and would wreck, eventually, the happiness of both children and both families. They maintain that they never would have given their consent to such a marriage, had it been requested of them by the young couple. They maintain that Edward Mathewson has not the education, the position nor the income to make a suitable husband for their daughter Geraldine; that he has not the will to acquire an education to fit himself for such a relationship to their family, and they pray the court to relieve their daughter from what they claim to be a tragic, unfortunate, unhappy marriage.

Section 7, subdivision 1, of the Domestic Relations Law, as amended by chapter 313 of the Laws of 1922, provides as follows:

" Sec. 7. Voidable marriages. 1. Is under the age of legal consent, which is eighteen years, provided that such nonage shall not of itself constitute an absolute right to the annulment of such marriage, but such annulment shall be in the discretion of the court which shall take into consideration all the facts and circumstances surrounding such marriage."

Annulment of a marriage for non-age is no longer a matter of right but rests now in the sound discretion of the court. Having this fact in mind, great latitude was given to the parties in this case, so that they might develop all the facts and circumstances attendant upon this marriage.

The marriage has been consummated, but no children will grace the union, so that element is not here to trouble the court.

Persons under the age of eighteen years may now contract a valid marriage, and such a marriage will not be annulled at the mere desire of the parties. (*Todaro* v. *Todaro*, 120 Misc. 807; *Lazarczyk* v. *Lazarczyk*, 121 id. 723; 122 id. 536; *Foley* v. *Foley*, Id. 663, 664.) Under what circumstances will the court be moved to exercise its discretion in granting the annulment of such a marriage? In the case of *Lazarczyk* v. *Lazarczyk* (*supra*), an annulment case brought under the above-quoted section, Mr. Justice EDGCOMB said (at p. 538): " No hard and fast rule has been laid down by which it can be determined just when the discretion

of the court should be exercised in favor of an annulment and when it should not. The result must be governed by the facts surrounding each case. The Legislature has seen fit to provide that under certain circumstances a husband and wife can legally live separate and apart. Our statutes provide not only for a divorce, but for a .separation from bed and board. It might well be said that in an action brought by one under the age of legal consent to have a marriage declared a nullity, evidence which would satisfy the court that there was a just ground for a divorce or separation would warrant the court in exercising its discretion and annulling the marriage. I do not mean to say that such discretion should only be exercised in case the defendant were found guilty of adultery, or of cruel and inhuman treatment, abandonment or failure on the part of the husband to provide for the wife. Other situations might arise which would warrant the abrogation of a marriage."

In *Foley* v. *Foley* (*supra*), an annulment case, brought under the above section, Mr. Justice CHENEY said (at p. 664): "In commenting on this amendment the court has said: 'It is obviously the intention of the Legislature to abolish the license afforded by the prior state of the law to permit persons under eighteen years of age to make trial marriages which they could repudiate without penalty. It recognizes that a marriage may be validly contracted by a person under that age that public policy dictates should not be annulled at the mere desire of the parties. The discretion of the court should be moved by consideration of whether an advantage has been taken of the inexperience of the plaintiff to entrap her into a relation that she would not have assumed, if endowed with more mature judgment, or whether the legal status of a wife was entered into without serious intention of assuming its responsibilities.' *Todaro* v. *Todaro,* 120 Misc. Rep. 807. 'Courts should in the future, and no doubt will, exercise extreme care in these cases, and unless sufficient facts and circumstances surrounding the marriage are shown to justify a finding of annulment, outside of mere non-age, will refuse a decree.' *Lazarczyk* v. *Lazarczyk,* 121 Misc. Rep. 723.

" No measure is set by the statute by which the discretion which it vests in the court is to be gauged, except ' all the facts and circumstances surrounding such marriage.' "

The defendant Edward Mathewson cites the *Todaro* and *Lazarczyk Cases* (*supra*) as authority against granting an annulment herein. Those cases are to be distinguished from the instant case for the reason that the annulment was denied therein upon the ground that the marriages in question were contracted with the consent of the

parents of the infants and in the *Lazarczyk* case a child had been born of the union. These elements are lacking in the present case.

In the *Foley Case (supra)* Mr. Justice CHENEY granted an annulment upon a state of facts somewhat similar to those of the instant case. In that case the plaintiff was fifteen years old and the defendant was seventeen. Without the knowledge of their parents, they ran away and were married. Immediately after the marriage, they returned to their homes. Before it was consummated, action was brought to annul the same. The court said (at p. 665): "The public policy expressed in that case is reflected in the recent legislation. It is evident that there are two classes of such marriages, in one of which the marriage is followed by cohabitation, and the other where it is not. In the first class the interests of children or possible children are to be considered, and it may well be said that such a marriage should not be annulled unless there are circumstances which would entitle the infant to relief, such as would permit of a divorce or a separation as illustrations. In the second class such other interests are not involved, and the determining factor should be whether or not under all the circumstances of the case it is probable that a successful marriage and a true family relation will result from the union of the two persons, and consideration should be given to the immaturity and lack of education in the essentials of the family relation, and the ability of the husband unassisted to support a home.

"In this case both contracting parties are very young, the boy seventeen years old and the girl fifteen; they are of different religions; they have not had much education, the boy having attending grammar school only, and the girl just commencing high school work. While no criticism is made of the boy's character, he has no financial ability, he has no trade and is working practically as a laborer in a shop, where his earnings are small.

"Under all the circumstances, it would seem that the interests of both these persons and that of the public as well would be best served by avoiding this foolish act committed by them and annulling the marriage."

Although the parties to the marriage in question are somewhat older than those in the *Foley* case, and although the marriage was consummated by cohabitation, nevertheless, in the absence of offspring or the probability thereof, I think the plaintiff brings himself within the rule laid down in the *Foley* case.

After a careful review of all the facts and circumstances surrounding this marriage, I am thoroughly convinced that this young lady did not know her own mind; did not realize or appreciate the duties and responsibilities connected with married life. She was

merely the victim of an ungovernable infatuation for a good looking boy. There was neither sense, rhyme nor reason in her proposal of marriage to this boy, nor in the duplicity which she practiced upon her parents. The character of both defendants is good. He was infatuated with her. There was neither rhyme nor reason in his consent to marry her. He did not understand or appreciate the duties and responsibilities of married life any more than she did. She had proposed marriage to him, and he was gallant enough to accept the proposal. The difference in status of this couple is such now that a successful marriage resting on a true family relation is impossible. Such a union, like a house built upon the sand, has little foundation, little substructure to sustain and support it. Its foundation will quickly crumble under even the weight of the responsibilities that lie upon the happiest and most provident marriages. Both of these children should be relieved for their own good, and for the good of their families, from this unfortunate union. Edward Mathewson is an intelligent boy; relieved of marital obligations, he can return to school and equip himself for some kind of professional work and make a mark for himself in the community. If his passion survives the passage of the years, and ripens into deep and abiding affection, he may, under more favorable circumstances, renew his suit for the hand of Geraldine. If she is like-minded, they can rewed.

The great difficulty, at the present time, lies in the fact that many parents take little interest in respect to the marriages of their children. They seem glad to have them " off their hands." Those who do should be commended for their faithfulness. Other things being equal, right-minded parents should have the deciding vote in selecting the life partners, at least, of their minor children. No one has a moral or legal right to steal an innocent girl of seventeen from the bosom of her family and marry her without her parents' knowledge or consent. It is the duty of parents to prevent their minor children (especially girls) from contracting improvident marriages, and to rescue them from such unions when, as far as the parents are concerned, they are clandestinely formed. In a proper case, the court should not turn a deaf ear to the appeals of grief-stricken parents of a young girl who finds herself thus entrapped.

Taking into consideration all of the facts and circumstances surrounding this unfortunate marriage, I am clearly of the opinion that the interests of this young couple, of their parents and of the public, will best be served by granting an annulment as prayed for herein. The plaintiff, therefore, is entitled to a decree annulling the marriage, without costs. Findings and judgment accordingly.